May it please the court, Todd B. Kraft for the petitioner Hazmik Halajanyan. I'd like to begin by reading one sentence from the immigration judge's decision. The immigration judge states, Following sentences, when she was interrogated again, comma, she was beaten by the officers loss, comma, and, quote, they hit me very hard on the stomach, comma, I lost my consciousness, close quote. Ms. Halajanyan submits that there is many sentences like this in the immigration judge's decision that are certainly less than cogent. This court requires that an adverse credibility finding be based on cogent and specific reasons. Moreover, it's indicative of the immigration judge's rush to make a decision without adequately and thoroughly reviewing the record. Additionally, the immigration judge does not read Ms. Halajanyan's declaration charitably given the fact that it was prepared without the advice of counsel. The declaration is barely a page and a half and the English is poor and may be described as broken English. Moreover, the immigration judge bases her adverse credibility ruling on the fact that Ms. Halajanyan added more information when she was testifying that was not present in her declaration. This is not permissible under Ninth Circuit case law. The immigration judge hones in on a number of instances that she believes the petitioner, Ms. Halajanyan, was not consistent. She is concerned with how Ms. Halajanyan presents the fact that she was physically harmed. In her declaration, she states that she was hit on the stomach and the back and then that she lost consciousness. When she testifies, she states that she was hit on the back and on the head and then she lost consciousness. It's Ms. Halajanyan's position that this is not inconsistent. It is not contradictory. It adds information. It's in harmony with what she wrote in her declaration. The immigration judge is also concerned with how Ms. Halajanyan left the hospital. In her declaration, she states, when I was released from the hospital, I continued my treatment at the clinic. In court, she states that she was watched by guards at the hospital and that she had to escape. Her attorney asks why this was not in her declaration. Before she can answer, the immigration judge interrupts and to some extent is critical of Ms. Halajanyan and wonders how she could possibly escape in her bathrobe. Ms. Halajanyan does respond that she did not know it was important to state that she had been detained in the hospital and that she had to escape. It's Ms. Halajanyan's position that that is consistent with a charitable reading of her declaration, which was prepared without the advice of counsel. Well, I'm not so concerned about advice of counsel when it comes to a factual story. How is that consistent with the factual story given in the declaration? Well, Your Honor, I believe that an attorney would review a translation made for a declaration. Of course, Ms. Halajanyan's first language is not English. Reading the declaration, one can see that it's very poorly worded. The English is not very clear. It's not very well structured. I do believe that she does not in her declaration make an actual assertion. I was released from the hospital. It's within the context of a phrase. When I was released from the hospital, I continued my treatment at the clinic. I believe that a charitable reading would create some consistency. She left the hospital. The word that was used may not have been the best, Your Honor. Well, did her testimony say the same thing? She said that she left the hospital. However, the manner she left the hospital, she left the hospital, she had to escape the hospital. Is there any reference to going back to the clinic afterwards for more treatment? I don't believe, Your Honor. Well, isn't that an inconsistency? Well, I think that, Your Honor, I believe she said when she left the hospital, she went back to the clinic. I don't know that they are the same place, Your Honor. The fact that two different words were used may indicate that there were two different places. The immigration judge is also concerned with the presentation of information regarding her son's detention. She states in her declaration that her son was detained in the year 1998 for a week and was released on March 24, 1998. In court, she states that her son was arrested on February 17th and then released on March 24th, a week later, the same year. When confronted with that seeming contradiction, her attorney states to her, February 17th to March 24th is five weeks. How can that be one week? I don't believe that she was attempting to enhance her claim with this extension of time. She could not understand the math. She apparently misspoke. She insisted that February 17th to March 24th was seven days. I don't believe that this was an attempt for her to mislead the court or in any way did that enhance her claim. The immigration judge was also concerned with a description of an attempt on her life by a motor vehicle. Ms. Halajanyan, in her statements, said that she saw her friend across the street and was going to talk with her friend. The friend, Amalia, in her declaration, Amalia's declaration, states that Ms. Halajanyan, was coming down the street in front of me. Again, Ms. Halajanyan, Amalia's declaration was very brief, about five sentences, not the best translation. I don't think that this is an inconsistency, considering the translation issues that may have been present. The immigration judge is also concerned with a couple of other issues. One, whether or not Ms. Halajanyan was in Armenia at the time, based on her son's asylum declaration, which stated that she was in Russia in 2001, when Ms. Halajanyan stated that she was active in a women's group. The government and the judge state that her son reiterated this story when he was in court in Ms. Halajanyan's case. However, what her son, Ms. Halajanyan's son, stated was that at the time he submitted his asylum application, he believed it was true that his mother was in Russia. He explained that discrepancy. He was told by his mother, he was under the impression that his mother needed to leave Armenia, and that she probably, or she went to Russia. He didn't know if she went to Russia. That's his explanation. I think it's sufficient the judge didn't consider the sufficiency of that explanation. And finally, the judge is concerned with, Your Honor, I'm going to conclude now and reserve the rest of my time for rebuttal. That's fine. And we'll hear from the representative of the Attorney General. Good morning, Your Honor. It's Dallin Holder for the Attorney General. May it please the Court. At the very heart of an asylum applicant's claim is her credibility. Ms. Sharikian did not tell the truth. Emboldened by this, I now grant to her son. That's the last case. Sharikian was the last case. I'm sorry. I'm sorry, Your Honor. I apologize. It's all right. It's the same. That's what I said during the last case, too, is you're a wrong man. It's very true. The two claims are similar. They're both based on the claims of their sons. They're both from Armenia. And both claims are based on adverse credibility. But in this case, this case is solely based on adverse credibility. And the immigration judge made several findings here that are constituting, that do constitute substantial evidence and support the agency's denial of relief. I think most important is the issue regarding where Petitioner was when she claimed the events transpired in Armenia. She presented evidence from her son as a corroborating witness who claimed in his asylum application that she went to Russia. Opposing counsel argued that he did believe this was true when he submitted his asylum application, but this fails to explain why he continued to believe this was true, not only at the point she prepared her asylum declaration, but also during the hearing. The petitioner lived with her son at the time of the hearing, so there's no reasonable explanation for why he would continue to believe that. But I think even more telling is that he argues when confronted by this equivocation, he further says, well, she returned illegally. Well, that begs the question that if she returned from Russia illegally to Armenia, that means she was in Russia. Petitioner never claimed to have gone to Russia. Was she ever asked about the purported discrepancy? Your Honor, she was questioned on her claims regarding where she was at the time she was involved in the Women's Committee, but she was not questioned after her son testified regarding where she was. But I think that failure was a failure of redirect of her attorney to bring her back on stand and to question her regarding that issue. I think the immigration judge was more than qualified to compare the two testimonies and see that one corroborating witness had said that she went to Russia. He had provided an explanation, which he simply did not believe, which was that she had returned from Russia or he did not have contact with her, or they didn't talk about events in Armenia because they were so painful. But I think the immigration judge was free to disbelieve that claim. But this does hark back to the other case. Can you say witness A is not credible because witness B either says something inconsistent with his testimony or simply says something inconsistent with what witness A says? Well, let's get to real names. In this case, the petitioner in this case is deemed not credible, not based on anything she says or does, but because this purportedly corroborating witness puts her someplace else. Well, that means there's tension between the two, but I'm not sure how that leads to a conclusion that she wasn't telling the truth. Maybe her son wasn't telling the truth for whatever reason. It may not be the case in every case, but in this situation, she lived with her son at the time of the hearing. Her claims were based loosely initially on his claims, but also later on her own. But I think the important point here is that at the time he testified, they were living together. They should have discussed. It's implausible to think that they wouldn't have discussed these things and he wouldn't have corrected in his mind that she went to Russia or didn't go to Russia. But I think it does go to show that if she never claims that she went to Russia, he does claim that she went to Russia, it questions whether or not she was even there. I think it does question her credibility. I think it definitely goes to that issue. But even if this court continues to find an issue with that, I think even more important is the fact of when she discussed her escape from the hospital. I think that is a glaring inconsistency because in her declaration, she argues that she was taken to the hospital for treatment. She later followed up by going to the clinic. She doesn't claim that she was held. The reason that is important in this case is because it goes to show the continued interest of her alleged persecutors in her. If they did not continue to hold her at the hospital, then there's a lack of continued interest in her. If she was able to later leave the hospital and follow up at a clinic or at the hospital, depending on how you read the declaration, for further treatment, it removes the well-founded fear. But it also just basically goes to show that she tried to enhance her testimony when she presented her case to IJ after she had presented her declaration. Was that issue raised with her? Was she asked about the apparent discrepancy from what she said in the declaration? Your Honor, she was asked several questions regarding her declaration. It was difficult to get answers out of Petitioner. I think when you go through the transcript, you can see the frustration of not only the immigration judge but also of her counsel and DHS counsel in getting a clear answer from her. And that was actually one of the immigration judge's findings regarding her being evasive, her demeanor being indicative of a lack of credibility, and her answers being vague. I think that it's often difficult to point to one issue on a cold record regarding where somebody is not telling the truth. But when you are the trier of fact and you're sitting in front of an individual who's trying to convey a story and they're vague, they're evasive, they're nonresponsive, those issues should go clearly towards whether or not she's credible. But in this case, we have more. We have the issue of where her son says she was. We have the issue of whether or not she escaped the hospital or whether she was allowed to leave. We also have the issue of her son's first arrest. She testified that he was arrested on February 17th, held for one week, and released on March 24th. The transcript is incredibly telling on this point because there are pages and pages of her attorney trying to get her to give the right answer. If it's pretty clear, she was very consistent that her son was held for one week. And it does appear that she was confusing February and March, that she said February 17th and she said March 17th. She was absolutely clear that he was held for one week and that he was released on March 24th. Since she's consistent on that point, it's hard to falter on the going back and forth between February and March. She obviously is confused on that point. Your Honor, that's a reasonable explanation, but we're not here to discuss reasonable explanations. We're here to discuss whether or not it compels that conclusion. And I think the immigration judge was more than allowed to say, look, you're equivocating regarding the date. If he's so persistent, or rather she is so persistent about saying one week, on its face, the February date does not compute. The only thing you can make out of that is that, as others of us have been known to do, she got tangled up in which month it was. I think it's reasonable to say she got tangled up in the story she was trying to remember. And I think that when you look at it, there's two issues with it. Not only is it regarding one week, how long she was held, because clearly she was not possibly been right on a full month being one week. But it was also the dates. Was it March or was it February? Those are important to the later facts of the asylum claim because it determines when the incidents regarding her and her husband happened. Whether they came to her house and they actually harmed her husband. As we point out in the brief, it's material because it means that their house could not have been searched in February if he was not detained until March. This is an enormous problem with this case, and I think it definitely goes to the heart of the claim. Further inconsistencies, which I think add on. This court may not find them individually probative, but I think together, collectively, they show that she wasn't telling the truth regarding the location of the injuries. The immigration judge looked several times and could not see a scar where they were pointing out there was a scar. I think, as I pointed out, there was an issue with demeanor. I do want to start. Wasn't that the last case? Was there a scar here? Yes. Oh, the injuries. I'm sorry. I apologize. I've done that several times. The issue was regarding where she was injured before she passed out and whether or not she was. They claimed that she was hemmed back and then the stomach, and later she talked about being hemmed back and then the head. Individually, maybe she could have made an equivocation regarding this, but it's not consistent. It certainly isn't consistent. I read that testimony again this morning, and I have to say I wasn't very impressed that there was an inconsistency there. It just – she said she got hit in the back and the stomach. She said she got hit in the – later she said she got hit in the stomach and the head. Right. The Declaration, page 266, says, They hit me very hard on my stomach. Then I was beaten by the officers. I lost my consciousness. She testified later, which you'll find at AR-141. She testified, He striked me on my head and my back and that I fell down unconscious. Yeah, and before the – but on page 266, before you read that, there was also a place where she said, I was hit on my stomach area, back area. Yeah. There's certainly another reading which can be given there, but I think that if we're here to examine whether or not it's compelling evidence that she has the burden of proof, I think there's a reasonable reading of that that immigration finds that, in addition to her other inconsistencies, that this is further proof that she's not remembering her story. And I think that that definitely additionally goes to her credibility. I think the last point I want to point out is the husband's whereabouts, completely vague. We don't know where the husband is at most times, and these are things that she would know. And I think the last part is – And how does that go to her credibility? Well, it seems like when she testifies, she talks about things happening to both her and her husband. But then she's completely vague at being able to identify where her husband is, which would be important because she claimed that he was sick. And so if he's also being persecuted, you think these memories, if they – these incidents, if they really happened, would be significant to her. So if she's being vague about that, that's an addition to the fact that she's possibly not telling the truth. Is she here? She is. Well, the issue is when he came to the United States, when he returned to Armenia, we don't know. The immigration judge didn't know what to know regarding the husband. And the government doesn't know. Well, we don't know. Or at least I personally don't know if he's here or not. Her testimony is that he returned to Armenia. As I see I've gone over my time, I would like to just sum, if possible. We've heard that before. All right. Thank you. I appreciate it. And we submit on the briefs. Thank you. And we'll hear again from counsel for petition. Your Honors, the only thing that Ms. Halajanyan would add is that if there is any issue regarding any sort of inconsistency between her son's testimony and her testimony, Ms. Halajanyan's testimony, she was not properly given an opportunity to explain that, which is required under case law. It is a bit of a problem, though, because this is her corroborating evidence, and it turns out to contradict her. And that would seem to be a problem for her. She said, well, here's my best evidence. Here's my son. Her son said something that's inconsistent with what she just said. Your Honor, my reading of the transcript, that when he testifies, he does not state at the hearing that he believed his mother was in Russia at the time. What he does do is confirm that when he filed his asylum application, he believed that the contents were true, and part of the contents was a statement by him, her son, Ms. Halajanyan's son, that she was in Russia at the time. He does explain that he was under the impression that she was leaving, but however, he states that he never particularly confirmed that she had left for Russia. And otherwise, I think the weight that can be given may be noted by Judge Clifton when he states that who are we to penalize if there is some inconsistency. However, I think maybe the higher issue is once an inconsistency may or may not have been established, Ms. Halajanyan was not given, as required, her opportunity to explain it as well.
judges: Noonan, Clifton, Bybee